Ronald A. SCHACHAR, et al., Plaintiffs–Appellants,

v.

AMERICAN ACADEMY OF OPHTHALMOLOGY, INC., et al., Defendants–Appellees.

No. 88–2398.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 6, 1989.

Decided March 3, 1989.

Terry M. Grimm, Winston & Strawn, Chicago, Ill., for plaintiffs-appellants.

Peter S. Hendrixson, Dorsey & Whitney, Minneapolis, Minn., for defendants-appellees.

Before BAUER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

There can be no restraint of trade without a restraint. That truism decides this case, in which eight ophthalmologists contend that the American Academy of Ophthalmology violated the antitrust laws by attaching the label "experimental" to radial keratotomy, a surgical procedure for correcting nearsightedness.

Nearsightedness (myopia) occurs when the cornea of the eye does not focus light on the retina. A thick cornea bends light excessively, so that the focal point falls short of the vision receptors. Glasses and contact lenses correct the problem by introducing an offsetting distortion; the net effect of the series of lenses is a proper focal point. Radial keratotomy corrects the problem surgically. The ophthalmologist makes shallow incisions along radii of the cornea; as the cornea heals it becomes flatter, and vision improves.

Svyatoslav Fyodorov of the Soviet Union devised radial keratotomy in 1973. American physicians, including some of the plaintiffs, started performing the operation in 1978. Even the most promising medical developments often turn out to have drawbacks, whose nature and magnitude should be determined. Many who have undergone radial keratotomy report improvement in their eyesight (sometimes so much change that they become farsighted). What are the long-run consequences? Most persons' visual acuity slowly changes with time. Does the eyesight of those who have had this operation change in different ways? Might the invasive procedure weaken the eye in a way that creates problems of a different kind? A surgical procedure used in Japan in the 1950s caused "corneal decompensation" about ten years later, a serious condition leading to blindness (avoidable with corneal transplants). Radial keratotomy is different, but once burned twice shy.

In January 1979 the National Advisory Eye Council, the principal advisory body to the National Eye Institute (part of the National Institutes of Health) called refractive keratoplasty (a group of surgical procedures that includes radial keratotomy) "experimental". In 1980 it applied this term to radial keratotomy specifically, calling on the profession to use restraint until more research could be done. As the federal government does not regulate surgical procedures, this was all a federal body could do. In June 1980 the board of directors of the American Academy of Ophthalmology —the largest association of ophthalmologists, with more than 9,400 members—endorsed the Eye Council's position. It issued a press release urging "patients, ophthalmologists and hospitals to approach [radial keratotomy] with caution until additional research is completed."

This suit under § 1 of the Sherman Act, 15 U.S.C. § 1, contends that the press release issued in 1980 was the upshot of a conspiracy among the Academy's members in restraint of trade. After a month of trial, the jury disagreed. The plaintiffs press objections to the jury instructions, including the district judge's puzzling refusal to define a product market even though the first question in any rule of reason case is market power. *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334–37 (7th Cir.1986); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 191 (7th Cir.1985). (The plaintiffs concede that the Academy's conduct should be assessed under the rule of reason.) Mulling over the jury instructions would be pointless, however, for this case should not have gone to the jury; indeed it should not have gone to trial. *All* the Academy did is state as its position that radial keratotomy was "experimental" and issue a press release with a call for research. It did not require its members to desist from performing the operation or associating with those who do. It did not expel or discipline or even scowl at members who performed radial keratotomies. It did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; it has no authority over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of surgery.

Plaintiffs concede that the Academy did not attempt to coordinate activities with these groups, actors independent of the Academy. Cf. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Zinser v. Rose*, 868 F.2d 938, 941 (7th Cir. 1989). Although plaintiffs believe that the Academy's prestige influenced others' conduct, plaintiffs also concede that after the Academy's press release in 1980 hospitals

still allowed them to perform radial keratotomies and many insurers reimbursed them for that work. In 1982 plaintiff Doyle Leslie performed 1,181 radial keratotomies; in 1983 he performed 1,314. Other plaintiffs performed fewer, and all believe that the demand for their services would have been greater if the Academy had not thrown its weight behind the position that their bread-and-butter was "experimental", but none maintains that the Academy prevented him from doing what he wished or imposed sanctions on those who facilitated the work. This uncontested fact required the district court to grant the Academy's motion for summary judgment and on this alternative ground we affirm the judgment in the Academy's favor.

Antitrust law is about consumers' welfare and the efficient organization of production. It condemns reductions in output that drive up prices as consumers bid for the remaining supply. *NCAA v. University of Oklahoma*, 468 U.S. 85, 103–07, 104 S.Ct. 2948, 2961–63, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed. 2d 1 (1979); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413–14 (7th Cir.1989); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 368–71 (7th Cir.1987). In a market with thousands of providers—that is, in the market for ophthalmological services—what any one producer does cannot curtail output; someone else will step in. See *Indiana Grocery* and *Ball Memorial*. Other trade association cases, such as *National Society of Professional Engineers, Inc. v. United States*, 435 U.S. 679, 98 S.Ct. 1335, 55 L.Ed.2d 637 (1978); *Wilk v. American Medical Association*, 719 F.2d 207 (7th Cir. 1983); *Moore v. Boating Industry Associations*, 819 F.2d 693 (7th Cir.1987); *Hydrolevel Corp. v. American Society of Mechanical Engineers*, 635 F.2d 118, 124–27 (2d Cir.1980), affirmed on other grounds, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); and *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 946–47 (2d Cir.1987), affirmed on other grounds, —— U.S. ——, 108 S.Ct. 1931, 1936 n. 3, 100 L.Ed.2d 497 (1988), involved enforcement devices. Perhaps members boycotted those who fell out of step (as in *Professional Engineers*), or perhaps the producers agreed "not to manufacture, distribute, or purchase certain types of products", as in *Allied Tube*, 108 S.Ct. at 1937. These enforcement mechanisms are the "restraints" of trade. Without them there is only uncoordinated individual action, the essence of competition.

Ophthalmologists are each others' rivals for custom. They offer competing procedures to cope with myopia—some surgical, some optical (glasses plus contact lenses of many kinds: hard, soft, extended wear). Plaintiffs say that the Academy is in the grip of professors and practitioners who favor conservative treatment, forever calling for more research (the better to justify the academics' requests for grants); plaintiffs portray themselves as the progressives, disdaining the Academy's fuddy-duddies in order to put the latest knowledge to work. Warfare among suppliers and their different products *is* competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law. *Indiana Grocery*, 864 F.2d at 1413–14; *Ball Memorial*, 784 F.2d at 1338–39. Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an antitrust case, no reason to investigate further to determine whether the restraint is "reasonable".

*Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284 (5th Cir.1988), holds that when a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws. See also *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 486–89 (1st Cir.1988). We agree. An organization's towering reputation does not reduce its freedom to speak out. Speech in-

formed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor. The Academy's declaration affected only the demand side of the market, and then only by appealing to consumers' (and third-party payors') better judgment. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas.

Plaintiffs' "smoking guns" show how far this case strayed from the point of antitrust law. Plaintiffs observe that the Academy never before had called a surgical procedure "experimental"; that it acted on the recommendation of the Eye Banks Committee, which they view as unfit to render advice about the topic (after 1982 the Academy gave the subject to a different committee); that the Academy's president in 1980 admitted that he wanted to stop the "proliferation" of radial keratotomy (one would expect no less if he thought the procedure should be treated as "experimental"). Then there is the crowning insult: in 1981 the Academy's president called plaintiff Ronald Schachar "impudent and idiotic" for "demanding that I answer a series of eight or nine questions which he had seen fit to put to me", "despite [plaintiffs say] having had ... Dr. Schachar's chief of surgery at the University of Chicago tell him that Dr. Schachar was among the very brightest students he had ever taught." We may assume that professors at the University of Chicago are infallible judges of talent and that bright ophthalmologists have flawless judgment; what this bickering has to do with the Sherman Act is a mystery. Animosity, even if rephrased as "anticompetitive intent", is not illegal without anticompetitive effects. *Moore,* 819 F.2d at 696 (reversing a verdict because the instructions told the jury that purpose *or* effect supported a finding for the plaintiff); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379–80 (7th Cir.1986); *Ball Memorial,* 784 F.2d at 1338–40; *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232 (1st Cir.1983); Philip E. Areeda, 7 *Antitrust Law* ¶ 1506 (1986).

Plaintiffs' fundamental position, stated in its reply brief, is that: "Issuing such a statement [calling radial keratotomy "experimental"] carried with it an obligation to the public, ophthalmologists, and third party payors to have studied the procedure and reached a considered opinion." Putting to one side the conundrum that once you have "studied" something it is no longer "experimental"—that the declaration of "experimental" status logically precedes the gathering of information—we do not perceive what this has to do with antitrust. See *Indiana Grocery,* 864 F.2d at 1413 (the Sherman Act "does not reach conduct that is only unfair, impolite, or unethical"). The Sherman Act is not a code of medical ethics or methodology, and whether radial keratotomy *is* "experimental" is a medical rather than a legal question.

AFFIRMED.