## MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.

v.

## AMERICAN BAR ASSOCIATION, et al.

### Civil Action No. 93–6206.

United States District Court, E.D. Pennsylvania.

Aug. 29, 1996.

Michael E. Baylson, Melissa H. Maxman, Duane, Morris & Heckscher, Philadelphia, PA, for plaintiff.

Barbara W. Mather, L. Suzanne Forbis, Pepper, Hamilton & Scheetz, Philadelphia, PA, H. Blair White, David T. Pritikin, David R. Stewart, William H. Baumgartner, Sidley and Austin, Chicago, IL, Mark P. Edwards, Jay H. Calvert, Jr., Joseph B.G. Fay, Morgan, Lewis & Bockius, Philadelphia, PA, Robert A. Burgoyne, David M. Foster, Sally P. Paxton, Jacqueline R. Depew, Kenneth R. Carretta, Fulbright & Jaworski, Washington, DC, Scott Stempel, Mariam J. Naini, Morgan, Lewis & Bockius, Washington, DC, Joan

E. Van Tol, James M. Vaseleck, Jr., Law School Admission Council, Newtown, PA, for defendant.

### OPINION AND ORDER

DITTER, District Judge.

## I. INTRODUCTION

For many years, the American Bar Association has evaluated law schools using a set of standards it has developed for that purpose. The Massachusetts School of Law brought this antitrust action against the American Bar Association, the Law School Admission Council, Law School Admission Services,[1] and the Association of American Law Schools[2] after ABA denied it provisional accreditation. MSL alleges that the defendants violated the Sherman Act by restraining trade with anticompetitive policies[3] and conspiring to monopolize, and monopolizing the law school training field, the accreditation of law schools, and the licensing of lawyers.[4] It seeks treble damages, interest, and costs. It does not seek accreditation as part of this lawsuit.

MSL maintains that *some* of the standards that ABA uses to inform its accreditation decisions violate the Sherman Act. Plaintiff's restraint of trade claim rests on its contention that the ABA's adoption and approval of the standards have the purpose and effect of artificially enhancing faculty salaries, limiting the services of law school professors, imposing unnecessarily costly guidelines for law school libraries, increasing law school tuitions, and "freezing out of law school persons from lower socio-economic classes and persons in mid-life." Plaintiff's monopolization claim is based on its contention that the defendants have worked in concert, using some of the ABA's standards, to monopolize the law school training, accreditation, and licensing processes.

Before me is ABA's motion for summary judgment.[5] It contends that judgement should be entered in its favor for six independent reasons: (1) MSL's alleged injury stems exclusively from the bar admissions rules of the sovereign states, not the ABA standards; (2) MSL cannot demonstrate an injury to competition between or among law schools generally resulting from the ABA's decision not to accredit MSL; (3) MSL cannot demonstrate that the ABA standards that it is challenging were the cause-in-fact of its injuries; (4) the antitrust laws do not apply to the non-commercial aspects of higher education; (5) even examining the particular challenged standards under a rule of reason analysis, no triable issue exists and judgment is proper as a matter of law; and (6) the conspiracy alleged by plaintiff is illogical and makes no economic sense. For the reasons discussed below, I will grant ABA's motion.

## II. STATEMENT OF FACTS

MSL is a Massachusetts corporation that has been operating a law school in Andover, Massachusetts, since 1988. In 1990, MSL was authorized by the board of regents of the Commonwealth of Massachusetts to award the degree of *juris doctor* to its graduates. That authority enables plaintiff's graduates to sit for several bar examinations, including Massachusetts'.

1. The LSAC and LSAS work together under the name LSAC/LSAS. In part, they sponsor, administer, and profit from the Law School Admission Test.

2. The AALS is an association of law schools. Its membership includes many ABA-accreditated law schools and it participates in the ABA accreditation process.

3. Section 1 of the Sherman Act provides:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal.
 15 U.S.C. § 1.

4. Section 2 of the Sherman Act provides:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor.
 15 U.S.C. § 2.

5. In addition to filing separate motions for summary judgment, LSAC/LSAS and AALS have joined ABA's motion.

In the fall of 1992, MSL applied for ABA accreditation. Accreditation is a valuable credential for a law school because all 50 states and the District of Columbia permit graduates of ABA-accredited schools to sit for their bar examinations. The prerequisites for taking particular bar examinations and ultimate admission to the bar are established by the states, not the ABA or any of the other defendants. MSL has its own approach to legal education, an approach that often differs sharply from ABA's more traditional views. Although it acknowledged that as a matter of policy, many aspects of its program did not comply with the ABA standards that guide accreditation decisions, MSL requested a variance for each of the standards which it had refused to follow.[6]

Following its usual procedure when making accreditation decisions, ABA sent a site evaluation team to examine MSL's program. Based on that team's factual report about MSL and MSL's response, ABA denied MSL provisional accreditation. A series of appeals taken by MSL were fruitless.

MSL maintains that its failure to secure ABA accreditation handicaps the school in competing for students because its graduates cannot take the bar examinations of 42 states, and the school has been generally stigmatized by the denial. (Compl. ¶¶ 18, 41; Velvel Dep., 8/25/94, at 30:1–15).

In summary, this case concerns the evaluation of educational philosophies, methods, and facilities. ABA's refusal to approve that of which it disapproves and MSL's demand to differ but be accepted as though it conformed—or as though its differences did not matter—are the bases for this suit.

## III. DISCUSSION

A number of courts have considered issues similar to those raised in MSL's complaint.

Application of these decisions to the case at bar lead me to conclude that judgment should be entered against MSL.[7]

A. MSL's Alleged Injury Results from Governmental Action not Private Conduct

ABA argues that MSL's alleged injury results from the independent decision of the sovereign states to preclude graduates of unaccreditated law schools from taking their bar examinations. ABA's position is based on the Supreme Court's seminal decision in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). *Noerr* involved an antitrust claim brought by long distance trucking companies against, *inter alia*, an association of railroads. The plaintiffs alleged that the defendants violated sections 1 and 2 of the Sherman Act by conspiring to restrain trade in, and monopolizing the long distance freight business. *Id.* at 129, 81 S.Ct. at 525. The plaintiffs claimed that the defendants had engaged in a propaganda campaign "to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." *Id.* The Supreme Court held that "where a restraint upon trade and monopolization is the result of a valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." *Id.* at 136, 81 S.Ct. at 529. The Court reasoned that when an antitrust-plaintiff's injury is proximately caused by the government, the government's action constitutes a supervening cause that breaks the chain of causation between an antitrust-defendant's action and any anticompetitive effect. Areeda & Hovenkamp, *Antitrust law* ¶ 201 at 14 (1994 Supp.).

To decide whether the *Noerr* principles apply, a court should ask: (1) what is

---

**6.** ABA standard 802 provides that:
 A law school proposing to offer a program of legal education contrary to the terms of the Standards may apply to the Council for a variance. The variance may be granted if the Council finds that proposal is consistent with the general purposes of the Standards. The Council may impose such conditions or qualifications as it deems appropriate.

**7.** As discussed more thoroughly below, no genuine issue of material fact exists. In this regard, it should be noted that although MSL continues to seek further discovery, thus far in this litigation, there have been 44 depositions taken, many of them over multiple days, in 14 states and two countries. Moreover, more than 100,000 pages of documents have already been produced.

the harm that the plaintiff alleges it suffered?; and, (2) is that harm the proximate result of governmental action or private conduct? If the harm results from governmental action, no antitrust liability will lie. Moreover, if the plaintiff alleges two harms, one the proximate result of private conduct and the other the result of governmental action, no liability will attach to the private conduct if the harm associated with that conduct is merely incidental to the harm associated with the governmental action. *Id.* at 143, 81 S.Ct. at 532–33.

Courts have had several opportunities to flush out the extent of *Noerr* immunity in various contexts. In *Lawline v. American Bar Ass'n,* 956 F.2d 1378 (7th Cir.1992), *cert. denied,* 510 U.S. 992, 114 S.Ct. 551, 126 L.Ed.2d 452 (1993), the plaintiffs sued the ABA and several other bar associations. They challenged as anticompetitive certain ethical rules adopted by the Illinois Supreme Court and the Northern District of Illinois at ABA's recommendation. The plaintiffs also challenged as anticompetitive certain ethical opinions promulgated by the defendant bar associations. They alleged that the rules and ethical opinions injured them by restricting their ability to advertise and to form partnerships with non-lawyers. *Id.* at 1382.

■ The Seventh Circuit upheld the district court's dismissal of the plaintiffs' antitrust claim. *Id.* at 1383. Relying heavily on the Supreme Court's decision in *Noerr,* the court found that when a trade association provides information but does not constrain others to follow its recommendations, it does not violate the antitrust laws. *Lawline,* 956 F.2d at 1383 (citing *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397, 399 (7th Cir.1989)). The basis for this finding is readily apparent—when a state adopts as its own the conclusions reached by a professional association (in that case the ethical rules and opinions and in this case conclusions about the quality of law school educations), it is the state and not the private

party that injures the plaintiff with anticompetitive conduct. *Id.* at 1384. As the Sherman Act does not proscribe states from engaging in anticompetitive conduct, *see Noerr,* no antitrust claim will lie against trade associations under these circumstances.[8]

In *Sessions Tank Liners, Inc., v. Joor Mfg., Inc.,* 17 F.3d 295 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 66, 130 L.Ed.2d 23 (1994), the Ninth Circuit rejected an antitrust claim brought against a corporation that had caused a prominent standard-setting organization to amend its influential fire code to the disadvantage of the plaintiff. Local governments either formally adopted the organization's standards, or, in some cities and towns where the standards had not formally been adopted, local officials refused to issue permits for structures that did not conform with the standards. *Id.* at 296. The plaintiff alleged that the standards injured its ability to compete for customers. In rejecting the antitrust claim, the court found that the plaintiff's injuries resulted from governmental action, not the defendant's conduct. *Id.* at 296. *Noerr* principles therefore applied to shield the defendant's conduct from potential antitrust liability.

. . . .

Plaintiff attempts to distinguish *Noerr, Lawline,* and *Sessions.* It argues that the instant case is different from those cases because here, the defendants (not the government) have inflicted the alleged injury. To determine the cause of plaintiff's alleged injury, a brief exploration of that injury is first necessary.

MSL contends that its failure to be accredited has caused it competitive harm by impairing its ability to solicit prospective students. (Compl. ¶ 41). The lack of accreditation limits its ability to solicit prospective students because many states preclude graduates of non-accredited schools from taking their bar examinations[9] and non-accredited

---

**8.** *See also Sanjuan v. American Bd. of Psychiatry and Neurology,* 40 F.3d 247 (7th Cir.1994) (Easterbrook, J.) (rejecting an antitrust claim brought against a trade association that declined to "certify" the plaintiff-doctors).

**9.** An excerpt from Mr. Velvel's deposition aptly states the school's position:

Question: And it is your belief that the reason that the students are less interested in the school today is because they cannot be admit-

schools bear a stigma.[10] (Pl.'s Resp. to Mot. for Summ.J. at 28 n. 12; Compl. ¶ 41). It maintains that both these factors cause it to lose students who would otherwise attend the school.

■ Any competitive disadvantage that MSL suffers because some sovereign states preclude graduates of non-accredited law schools from taking their bar examinations cannot be the basis for antitrust liability. This is what *Noerr*, *Sessions*, and *Lawline* say. The states decide who can sit for their bar examinations. I permitted MSL to explore this issue extensively and it has offered no evidence to show that ABA or the other defendants suggest, recommend, or decide who can sit for bar examinations or be admitted to practice in any state. When the impact of these independent governmental decisions is viewed within the context and nature of ABA's activity, it becomes clear that any injury that flows from state rules governing bar admission squarely falls within the prescripts of *Noerr*. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 494,

108 S.Ct. 1931, 1934, 100 L.Ed.2d 497 (1988).[11]

Moreover, any competitive disadvantage that MSL suffers because it "is stigmatized in jurisdictions in which graduation from an ABA-accredited law school is *not* a prerequisite for sitting for the bar examination," also comes within the *Noerr* doctrine (Pl.'s Response to Mot. for Summ.J. at 28 n. 12 (emphasis added); Compl. ¶ 41). Plaintiff alleges that in addition to the injury inflicted by the governmental restrictions, MSL suffers injury purely because of the denial of accreditation. MSL's argument here is no doubt presented in an effort to identify some independent ABA-inflicted injury thus putting this case outside of *Noerr*'s reach. While such an injury, on its face, might appear to be independent from the injury that flows from the governmental restrictions on bar admittance, the Supreme Court rejected a similar argument in *Noerr*, holding:

> the District Court found that the purpose of the railroads was to destroy the goodwill of the truckers, among the public generally

ted to the bar in states other than Massachusetts?
Answer: I am certain of it to a moral certainty, Mr. Pritikin. I think there is no legitimate doubt about it. I don't think that all the fancy lawyers and economists in the world would ever be able to remotely prove the contrary 'cause the contrary is not true.
(Velvel Dep., 8/25/95, at 30:1–15; Velvel Aff., 3/22/95, at ¶ 23(a); Compl. ¶18).

10. MSL also contends that it has suffered two additional injuries—in an effort to treat its hardworking faculty fairly, to maintain faculty morale, and to "have any chance of accreditation," MSL raised the salaries of its professors and bought more books for its library. (Velvel Aff., 3/22/95, ¶ 41(a); Pl.'s Surreply Br. in Further Opp'n to ABA's Mot. for Summ.J., at 3–5). MSL admits that, notwithstanding the increase, its starting salaries lag behind those at ABA accreditated schools. Despite this fact, MSL has consistently maintained that it has a highly skilled and "hardworking" faculty. (Complaint ¶ 12; Velvel Aff., 3/22/95, ¶ 41(b)). Therefore, although it contends that ABA's standards have artificially inflated faculty salaries, MSL admits that it has been able to avoid some of these high costs without sacrificing quality. Thus, rather than injuring MSL, ABA's standards have provided it with a competitive advantage—it can spend less on faculty than ABA schools and still purchase quality teaching services. Moreover, as these additional "injuries" result from MSL's unilater-

al decisions, I find that they are not an appropriate basis for potential ABA antitrust liability.

11. MSL also contends that the cases like *Noerr* are inapposite because they involved situations where the plaintiff's injury resulted from governmental adoption of allegedly anticompetitive doctrines, while in the instant case the state governments have merely relied upon ABA's accreditation decisions and not officially adopted the ABA's standards. This argument also misses the mark. In *Sessions Tank Liners*, although many local governments formally adopted the challenged standards into law, in some cities and towns, the standards were enforced not through explicit codification, but rather by having local officials refuse to issue permits for structures or activities that were inconsistent with the code. 17 F.3d at 296. In these cities and towns, the governments accepted the conclusions that the standards produced without explicitly adopting the standards themselves. *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 204 at 75–76 (1994 Supp.). This is identical to the instant case, where government has accepted the conclusions that ABA's standards produce without explicitly adopting the standards themselves. The alleged injury in both circumstances, however, is the same: graduates are precluded from being admitted to the practice of law in certain jurisdictions. As discussed, this injury results from a governmental, not private, decision and cannot therefore give rise to antitrust liability.

and among the truckers' customers particularly, in the hope that by doing so the over-all competitive position of the truckers would be weakened, and the railroads were successful in these efforts to the extent that such injury was actually inflicted. The apparent effect of these findings is to take this case out of the category of those that involve restraints through governmental action and thus render inapplicable [our finding that no antitrust claim will lie where governmental action is the proximate cause of the plaintiff's injury]. But this effect is only apparent and cannot stand under close scrutiny. There are no specific findings that the railroads attempted *directly to persuade* anyone not to deal with the truckers.

*Noerr,* 365 U.S. at 142, 81 S.Ct. at 532 (emphasis added).

The Court concluded that absent evidence suggesting that the railroads attempted *directly to persuade* anyone not to deal with the truckers, the loss of customer good will that the truckers suffered was merely *incidental* to the primary protected injury. In other words, if the railroads actively tried to convince people not to hire the truckers, and if as a result customers did not hire the truckers, the railroads' actions would not be protected under *Noerr*—the railroads' actions would cause an injury independent of the protected injury inflicted by the government. If, on the other hand, the railroads put negative information about the truckers into the marketplace in an effort to influence government action, and if as a result of that information customers chose not to use the

truckers, the railroads' actions would be protected as incidental to the protected injury inflicted by the governmental action—the governmental action would brake the chain of causation between the railroads' actions and the truckers' harm.

Just as there was no finding in *Noerr* that the railroads attempted *directly to persuade* anyone not to deal with the truckers, I find that no factfinder could reasonably conclude that ABA has attempted *directly to persuade* prospective students not to attend MSL. Here, as in *Noerr,* even assuming that MSL's failure to become accreditated resulted in "loss of prestige" or some abstract "stigma," [12] that injury is incidental to the primary, protected injury resulting from governmental decisions to preclude MSL graduates from taking certain bar examinations. [13]

Plaintiff maintains that its ability to compete for students is impaired by the denial of accreditation because: (1) its graduates cannot sit for many bar examinations; and, (2) it has been stigmatized. The former injury is clearly inflicted as a result of state action. Moreover, the latter injury is incidental to the primary protected injury. Therefore, MSL's claims are barred under *Noerr.*

### B. In Denying Accreditation, ABA Merely Expressed its Opinion which is Protected Under the First Amendment

Although I conclude that MSL's claims are barred by *Noerr* immunity, even assuming that the stigma injury is not incidental to the

---

**12.** I note that any stigma that MSL suffered as a result of ABA denying accreditation must be viewed in context. Since authorizing MSL to grant degrees, the administrative council in charge of educational standards in Massachusetts has repeatedly expressed concern over many aspects of MSL's educational program. In fact, in January of 1994, the council threatened to revoke MSL's degree-granting authority unless MSL could demonstrate that its admissions standards were reliable. (Ex. D in Supp. of ABA's Mot. for Summ.J., p. 2; Fallon Dep. at 54:6). The council was concerned that MSL was matriculating unqualified students so as to finance its more qualified ones. The council also expressed concern over the unprecedented number of formal written student complaints filed against MSL. (Fallon Dep. at 15:20–17).

**13.** This conclusion is strengthened by the Ninth Circuit's language in *Sessions.* Discussing *Noerr,* the Ninth Circuit wrote that:

The *Noerr* Court also rejected the proposition that petitioning immunity was limited to injuries flowing directly from governmental action. It held that the railroads were also shielded from liability for the harm the truckers suffered in their relationships with their customers. In the Court's view, that injury was "incidental" to the defendant's campaign to influence legislation.

*Sessions,* 17 F.3d at 299; *see also Allied Tube,* 486 U.S. at 499, 108 S.Ct. at 1936.

primary protected injury, MSL's claims still fail.[14] ABA contends that in refusing to accredit MSL, it merely rendered its opinion about whether the plaintiff met certain quality standards and that this opinion is protected speech under the First Amendment. There is support for ABA's position. *See, e.g., Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397 (7th Cir. 1989); *Zavaletta v. American Bar Ass'n,* 721 F.Supp. 96, 98 (E.D.Va.1989). Plaintiff maintains that ABA's argument "is patently frivolous."

■■■ It is axiomatic that the First Amendment protects speech, not action. Thus, the speech component involved in ABA's promulgation of standards is protected by the First Amendment and, because the Constitution trumps the Sherman Act, this speech component cannot be the basis for antitrust liability. However, any *conduct* associated with the standards is not entitled to First Amendment protection. Put differently, the *conduct* forming the basis of a restraint of trade or a monopolization is outside the First Amendment's reach. This flows logically from section 1 of the Sherman Act which requires "concerted *action* that unreasonably restrains trade." *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pennsylvania,* 745 F.2d 248, 256 (3d Cir.1984) (emphasis added).

Thus, in *Allied Tube,* the First Amendment *did not* insulate a trade association where the association's members included consumers, distributors, and manufacturers, and any agreement to exclude a particular product from certification was "an implicit agreement not to trade in that type of [product]." *Allied Tube,* 486 U.S. at 508, 108 S.Ct. at 1941. This implicit agreement—not the act of promulgating the standards—was the *conduct* forming the basis for antitrust liability. In fact, the Court explicitly emphasized that antitrust laws circumscribe the "conduct" of standard-setting associations. *Id.* at 506, 108 S.Ct. at 1940; *see also National Soc'y of Professional Eng'r, Inc. v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (antitrust violation properly asserted against association whose members *boycott* those manufacturers which do not follow association's position). Conversely, in *Schachar,* the court found no antitrust violation where a medical association publicly stated its belief that a surgical procedure was "experimental" and should not be performed absent more research. The association did not require its members to desist from performing the operation or forbid its members from associating with those who chose to perform the operation. 870 F.2d at 398. Unlike *Allied,* where the association's promulgation of standards led to conduct that could be the basis for antitrust liability, the association in *Schachar* merely stated its position. It took no action on which to predicate antitrust liability. By merely stating its position, the association in *Schachar* did not

---

**14.** MSL has presented some evidence which might be construed to mean that ABA has attempted directly to persuade potential students to attend accredited schools. For example, Mr. Velvel has testified that:

The ABA accreditors thus possess a monopoly not only because in most states it is necessary to graduate from an ABA school in order to take the bar examination and practice law, but also because *by continuous efforts they have persuaded potential law school applicants,* employers and the public that ABA accreditation is a *sine qua non* of quality and should be regarded as essential even in states (like Massachusetts) where the graduates of an unaccreditated school such as MSL can take the bar examination and practice law.

Here Velvel is not talking about injury to MSL, but to the reason why he feels ABA has an accreditation monopoly. He goes on, however, Many other persons who would otherwise apply to and attend MSL will not do so even

though they wish to practice law in Massachusetts, where MSL graduates can take the bar examination and practice law. The reason [these people] will not apply to MSL is that *the ABA has persuaded them and others that a law school cannot be a quality law school if it is not ABA accredited. . . .*

(Velvel Aff., 3/22/95, at ¶27, ¶28(a) (emphasis added)).

This statement merely points out what the ABA contends are the benefits of its accreditation product. While the corollary of attending an accredited school is not attending a school that has not been accredited, the injury remains incidental to the government's action. There is nothing wrong with the ABA's marketing its product—nothing wrong with its contending that its evaluation process provides benefits to prospective students and to the profession. The fact that various states agree does not make what ABA does unlawful.

"restrain trade" or monopolize the industry *vis-a-vis* the association in *Allied* which restrained trade by implicitly agreeing not to trade in a product. *See also Consolidated Metal Prods. v. American Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir.1988) (holding no antitrust violation where trade association provides information but does not constrain others to follow its recommendations); *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st Cir.1988).[15]

 When an association merely states its position, and a company is stigmatized because of that statement, there is no basis for antitrust liability.[16] ABA's constitutionally protected expression of its views and any resulting stigma that MSL suffers do not amount to ABA *conduct* on which to establish potential antitrust liability.[17] Like *Schachar*, ABA does not restrain trade or monopolize an industry by speaking out on an issue. ABA is entitled to state its position, provided it does not go further and somehow penalize those who do not subscribe to its position. *See Schachar*, 870 F.2d at 399 ("An organization's towering reputation

does not reduce its freedom to speak out"). If stigma results from simple expression, that stigma is incidental to the speech and cannot be the basis for antitrust liability. For example, in *Schachar*, the court found that the surgeons who performed the surgery were stigmatized by the association's warning and that this stigma led to a drop in business.[18] However, the court did not find any antitrust violation. This conclusion is sound. A contrary result leads to the anomalous situation that antitrust liability would attach to associations that put persuasive speech into the marketplace of ideas but not to those that put forth fluff. Antitrust laws do not exist to stifle the effects of speech. They exist to protect consumers and to stop conduct that disrupts the marketplace. Thus, any stigma that MSL has suffered because of ABA's not listing MSL as an accreditated school does not provide the necessary offensive *conduct* for antitrust liability.

 It is clear that ABA does not violate the Sherman Act when it merely pub-

---

15. MSL reasons that if extended to its logical extreme, this First Amendment analysis would protect "discussions by price fixing conspirators about the reasonable level at which prices should be adhered to in the marketplace...." (Pl.'s Resp. to Def. ABA's Mot. for Summ.J. at 30). However, the problem with MSL's reasoning here is that the illustration that it cites as the "logical extreme" involves *conduct*—conspiring to fix prices. In fact, in order for a conspiracy to fix prices to be actionable, there must be an *overt act. United States Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir.1993). This *act* or *conduct* is not protected by the First Amendment. MSL concedes as much when it states that this First Amendment rationale "can fare no better than an argument that the restrictive trade association *activities* involved in *Allied Tube* should be exempt from the antitrust laws...." (Pl.'s Resp. to Def. ABA's Mot. for Summ.J. at 30 (emphasis added)). *Allied* involved restrictive *activities*, not expression. Moreover, it is a fallacy to suppose.that just because a core concept of antitrust law cannot logically be extended indefinitely that the core concept is faulty.

16. This is different from the situation where an association states its position and then engages in conduct related to its stated position because where there is *conduct*, there is a basis for antitrust liability—the association has gone *beyond* expression.

17. The governmental decision to exclude graduates of unaccreditated schools from taking certain bar examinations is protected under *Noerr*. Because governmental action is responsible for this injury, ABA *conduct* is *not*.

18. MSL might attempt to distinguish the *Schachar* analogy by reasoning that, unlike the plaintiff in that case, it challenges ABA *standards* not ABA accreditation decisions. However, this is a distinction without a difference. No doubt, the association in *Schachar* maintained some standards. One standard might have provided that:

> a procedure is termed "experimental" until it has undergone two years of testing.

However, even if the association maintained such a standard, there is no *conduct* on which to base antitrust liability because by promulgating this standard, the association has done nothing more than to express its views on when a procedure is safe to perform. The situation would be different if the association's standard provided that:

> a procedure is termed "experimental" until it has undergone two years of testing and no member of the association shall deal or otherwise transact business with a doctor who performs "experimental" procedures.

In this latter scenario, the association has engaged in *conduct* directed at restraining trade. However, there was no such conduct in *Schachar* as there is no such *conduct* in the instant case.

lishes quality standards or expresses its views on which schools provide quality educations. Publication of an association's views, without more, is protected speech. Only ABA *conduct* can trigger antitrust liability. Abstract stigma that flows from the publication of speech protected by the First Amendment is not enough.

 The plaintiff in *Allied* produced plastic electrical conduit. Law schools *produce* educations. The association in *Allied* violated the antitrust laws by requiring its members not to deal with manufacturers of plastic conduit. This *conduct* violated the Sherman Act. ABA would violate the Sherman Act if it required its members not to deal with unaccredited schools (analogous to the manufacturers of plastic conduit in *Allied*). For example, ABA could not tell its members not to teach at unaccredited schools (limit the supply of production resources), work with graduates of unaccredited schools (limit customer base), or refer cases to graduates of unaccredited schools

(interfere with the manufacturer's business). However, ABA does none of these things. It does not keep its members from hiring graduates of unaccredited law schools. It does not restrict its members from making referrals to graduates of unaccredited law schools. It does not forbid its members from dealing with graduates of unaccredited law schools. It does not stop its members from teaching at unaccredited law schools. It does not prevent graduates of unaccredited law schools from joining ABA.[19] In fact, ABA in *no* way *acts* against schools that fail to satisfy its quality standards.[20] It does not even review schools that do not wish to be considered for accreditation. If they wish, schools can simply disregard ABA's standards.[21] ABA imposes no penalty on these schools and the injury associated with the governmental action to preclude graduates of unaccredited schools from sitting for some bar examinations is not ABA conduct. Indeed, ABA engages in no conduct that can trigger antitrust liability.[22] It merely ex-

---

**19.** A quick search in Martindale–Hubbel revealed that at least six MSL graduates have already joined ABA.

**20.** In its complaint, MSL points out that its students cannot transfer their credits to ABA accredited law schools, and its students cannot obtain LL.M. degrees from ABA accredited law schools. (Complaint ¶¶ 37(d), 37(e)). Although an argument might be made that these two rules amount to ABA conduct, I find that such alleged conduct is insufficient to preclude summary judgment. First, MSL has not produced *any* evidence indicating that it has been injured because of these two ABA rules. In fact, there is evidence indicating that MSL vigorously attempts to frustrate any student from transferring to an ABA-accredited law school by withholding transcripts and generally not cooperating with transfer efforts. In one instance, an MSL student needed to commence a lawsuit against the school to release her transcripts. *Riley v. Massachusetts School of Law, Inc.*, No. 91–910 (Sup.Ct.Mass.) Mr. Velvel had refused to cooperate with the student's transfer efforts because he maintained that the student had entered the school in bad faith, not intending to graduate, but instead planning all along to transfer to an accredited school. Moreover, the council in charge of higher education in Massachusetts noted:

> we continue to receive complaints from students who are unable to resolve complaints on their own with the law school. This includes the law school's refusal to accept certified mail from students, and difficulties in obtaining

transcripts and other information from various members of the administrative staff.
(Def.'s Ex. D to Mot. for Summ.J., at 3).
Second, these ABA rules are essentially extensions of the protected speech. ABA's speech would be meaningless if students of unaccredited schools could shoe-horn their unaccredited credits into an ABA accredited law school.

**21.** In fact, if a school disagrees with the standards, it should not simply pay lip service to them. Indeed, at least some members of MSL's faculty appear to agree with this sentiment as Mr. Velvel noted that "[t]here are people on our faculty who believe we'd be better off without [ABA accreditation]." Dick Dahl, *Massachusetts Weekly*, January 18, 1993, "A Maverick Law School's Maverick Pitch."

**22.** Nor do any of the other defendants engage in conduct detrimental to MSL's ability to compete for customers. Just like ABA, these other defendants may express opinions about quality within the profession, but they take no affirmative action. MSL maintains that LSAC also excludes it from certain LSAC recruitment forums. (Plf.'s Resp. to ABA's Mot. for Summ.J., Vol. II, at 120). MSL might contend that this is "conduct" which, through its conspiracy theory, is relevant in taking this case outside of the First Amendment's protection. However, as Judge Easterbrook noted in *Schachar*, "[a]ntitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual

**446**

presses its views on which law schools employ sound teaching methods. Such expression is protected under the First Amendment and cannot be the basis for Sherman Act liability.

## IV. CONCLUSION

The ABA, in the view of the 50 states, is quite good at setting standards for legal educators. As evidence of this, each state has concluded that graduation from an ABA accreditated law school is a sufficient basis to sit for its bar examination. The fact that the ABA has a reputation for being good at what it does, and that the states have elected to rely on the ABA accreditation process, does not transform that process, which is itself binding on absolutely no one absent state action, into an antitrust violation. If, the effect of governmental reliance on ABA accreditation decisions is to "freeze out" lower income people, to raise faculty salaries unfairly, and to require law schools to have too many books on their shelves, then any disgruntled law school, dean, student, or citizen can petition the state legislature to abandon its reliance on the ABA process. The answer is not to assail the ABA which has no authority over who may sit for bar examinations. The answer is to utilize the democratic process, for it is that process that gives force to the standards. Plaintiff's alleged injury that flows from governmental decisions to preclude graduates of unaccredited law schools from sitting for certain bar examinations, is protected under *Noerr*, and cannot be the basis for ABA liability.

If MSL is independently stigmatized because of ABA's denial of accreditation, that injury results from ABA's protected freedom of expression and not because of ABA's conduct. The Sherman Act regulates conduct, not speech. No factfinder could reasonably conclude that ABA has engaged in conduct that triggers antitrust liability.

foundations of antitrust law." 870 F.2d at 399. MSL cannot use the Sherman Act to compel LSAC, one of the organizations that administers the LSAT which MSL has publicly rejected as racially biased and unreliable, to assist MSL in marketing its product.

Finally, judgment should also be entered in favor of the other defendants in this case. In its complaint, MSL contends that the ABA's adoption and approval of the *standards* have the purpose and effect of restraining trade and that the defendants have worked in concert, using some of the ABA's standards, to monopolize the law school accreditation process. As I have found that maintaining the standards does not violate the Sherman Act, there is no basis for liability against the other defendants either. I will therefore enter judgment in their favor as well.[23] An appropriate order follows.

### ORDER

AND NOW, this 29th day of August, 1996, the American Bar Association's motion for summary judgment is hereby granted and judgment is entered in favor of the American Bar Association, Law School Admission Services (LSAS), Law School Admission Council (LSAC), and the Association of American Law Schools (AALS), and against plaintiff on all counts. It is hereby further ordered that the motions for summary judgment submitted by AALS, LSAS, and LSAC are denied as moot.

**23.** As I have found that MSL's alleged harm is not a proper basis for recovery, I need not consider the other grounds for summary judgment raised in ABA's motion.