[Cite as *Clarkwestern Dietrich Bldg. Sys. L.L.C. v. Certified Steel Stud Assn., Inc.*, 2017-Ohio-1091.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| CLARKWESTERN DIETRICH BUILDING SYSTEMS, LLC d.b.a. CLARKDIETRICH, | : | |
| | : | CASE NO. CA2016-05-098 |
| Plaintiff-Appellant, | | |
| | : | O P I N I O N |
| - vs - | | 3/27/2017 |
| | : | |
| CERTIFIED STEEL STUD ASSOCIATION, INC., et al., | : | |
| | : | |
| Defendants-Appellees. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2013-10-2089

Frost Brown Todd LLC, Matthew C. Blickensderfer, Stephen R. Hernick, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202 and Cohen & Grigsby, P.C., Anthony Cillo, Barbara Scheib, Fridrikh V. Shrayber, 625 Liberty Avenue, Pittsburgh, PA 15222-3152, for plaintiff-appellant

Taft Stettinius & Hollister LLP, Daniel R. Warncke, Kim K. Burke, John B. Nalbandian, Aaron M. Herzig, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202-3957 and Fox Rothschild LLP, Jeffrey M. Pollock, Robert J. Rohrberger, 997 Lenox Drive, Bldg. 3, Lawrenceville, NJ 08648-2311, for defendant-appellee, Ware Industries, Inc.

**RINGLAND, J.**

{¶ 1} This is an appeal from a decision of the Butler County Court of Common Pleas, in which the trial court granted summary judgment to appellees for claims involving the Ohio Valentine Act. For the reasons detailed below, we affirm.

{¶ 2} Structural and nonstructural steel framing products are used to frame commercial buildings because the International Building Code ("IBC") requires noncombustible framing materials. This dispute centers on certain nonstructural steel framing ("NSSF") products that provide framing for drywall.

{¶ 3} Clarkwestern Dietrich ("Clark Dietrich") is a joint venture formed by Clarkwestern Building Systems L.L.C. and Dietrich Industries, Inc. Both companies manufacture NSSF products for use in commercial construction. For purposes of continuity, we will refer to the joint venture as Clark Dietrich. While some background information is necessary to accurately detail the dispute between the parties, we may dispense with an exhaustive description of the specific technology and science behind the NSSF products and instead focus on the issues relevant to the Valentine Act claim.

{¶ 4} As previously noted, all NSSF products must comply with the IBC. IBC compliance may be demonstrated in a variety of ways. For example, a manufacturer may apply to an accredited code evaluation company and request independent proof of the product's code compliance. Alternatively, a manufacturer can also seek to have its products certified under a trade association's certification program.

{¶ 5} The dispute here arises between Clark Dietrich and the Steel Stud Manufacturing Association ("SSMA"). The SSMA is a voluntary trade association that represents approximately 85 percent of industry volume. Clark Dietrich was a member of the SSMA, as are numerous other firms also named as defendants in this action.

{¶ 6} Traditionally, NSSF products are manufactured from prime steel with a "G40" coating, which is a zinc-based coating that provides corrosion protection. In 2010, Clark Dietrich produced NSSF products through an innovative "cold reduction" process.[1] This

---

1. While this court is aware that the entities were distinct at the time, that fact is not material to the outcome of the case and for purposes of continuity will use the term Clark Dietrich.

process utilized less expensive secondary steel and provided other significant cost advantages based on the amount of steel required for each product. To meet applicable IBC requirements, Clark Dietrich applied an additional proprietary coating which, Clark Dietrich contends, will provide corrosion resistance equal or better than the standard G40 coating. Clark Dietrich refers to this product as G40 equivalent or "G40EQ."

{¶ 7} The development of the G40EQ product provided Clark Dietrich with a competitive advantage because of the lower manufacturing cost. Thus, the G40EQ product had a restraining effect on market prices and certain competitors of Clark Dietrich reduced their prices on the traditional G40 NSSF products to compete with Clark Dietrich's new G40EQ product.

{¶ 8} In 2010, the SSMA created an IBC compliance program for NSSF products. The compliance program ultimately adopted certain requirements that negatively impacted those SSMA members who utilized cold reduction and G40EQ products. Clark Dietrich, in its brief, refers to those requirements as "sham standards" and alleges that the Board adopted those requirements to benefit manufacturers who did not invest the resources to produce the G40EQ products. Eventually, Clark Dietrich resigned from the SSMA because it would no longer be able to produce the G40EQ products.

{¶ 9} Following Clark Dietrich's resignation, the SSMA released an industry letter announcing that Clark Dietrich was no longer SSMA compliant and advised that Clark Dietrich should be removed from SSMA member specifications.

{¶ 10} While Clark Dietrich's market share decreased after it left SSMA, the company continued to sell G40EQ products. From 2011 to 2014, Clark Dietrich shipped 650,000 tons of G40EQ product.

{¶ 11} Clark Dietrich filed this lawsuit against the SSMA and several individual manufacturing members, alleging a variety of claims. This appeal deals solely with alleged

antitrust violations under the Ohio Valentine Act. The trial court granted summary judgment in favor of SSMA, finding that Clark Dietrich failed to present evidence of an actionable claim under the Ohio Valentine Act. Clark Dietrich now appeals the decision of the trial court, raising a single assignment of error for review:

{¶ 12} THE TRIAL COURT ERRED BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

{¶ 13} In its sole assignment of error, Clark Dietrich argues the trial court erred by granting summary judgment in favor of SSMA on the Valentine Act claim.

{¶ 14} This court reviews summary judgment decisions de novo. *Ludwigsen v. Lakeside Plaza, L.L.C.*, 12th Dist. Madison No. CA2014-03-008, 2014-Ohio-5493, ¶ 8. Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there are no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law and, (3) when all evidence is construed most strongly in favor of the nonmoving party, reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St .3d 367, 369-70 (1998).

{¶ 15} The moving party bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of a genuine issue of material fact. *Robinson v. Cameron*, 12th Dist. Butler No. CA2014-09-191, 2015-Ohio-1486, ¶ 9. Once this burden is met, the nonmoving party has a reciprocal burden to set forth specific facts showing there is some genuine issue of material fact yet remaining for the trier of fact to resolve. *Id.* In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party. *Vanderbilt v. Pier 27, L.L.C.*, 12th Dist. Butler No. CA2013-02-029, 2013-Ohio-5205, ¶ 8.

{¶ 16} The Ohio Valentine Act is patterned after the federal Sherman Antitrust Act and the courts have interpreted the statutory language in light of federal construction of the

Sherman Act. R.C. 1331.01; *C.K. & J.K., Inc. v. Fairview Shopping Center*, 63 Ohio St.2d 201, 204 (1980). To establish a restraint of trade claim, a plaintiff must show both that there was a combination of effort, economically or by action, and that such effort unreasonably restrains trade in a relevant market. *Szuch v. King*, 6th Dist. Erie No. E-09-069, 2010-Ohio-5896, ¶ 53, citing *N.H.L. Players' Assn. v. Plymouth Whalers Hockey*, 325 F.3d 712, 718 (6th Cir. 2003).

{¶ 17} "Two approaches are used to determine whether a defendant's conduct unreasonably restrains trade: the per se rule and the rule of reason." *Id.* As Clark Dietrich abandoned its argument with respect to the per se rule on appeal, we will consider only the rule of reason approach.

{¶ 18} The rule of reason approach requires the plaintiff to prove all of the following: (1) that the defendants contracted, combined, or conspired; (2) that the contract, combination, or conspiracy produced adverse anticompetitive effects (3) within the relevant product and geographic markets; (4) that the objects of and conduct resulting from the actions were illegal; and (5) that the conduct was a proximate cause of plaintiff's antitrust injury. *Island Express Boat Lines, Ltd. v. Put-in-Bay Boat Line Co.*, 6th Dist. Erie No. E-06-002, 2007-Ohio-1041, ¶ 74, citing *Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005).

{¶ 19} As to the second prong, "[i]t is well-established that the purpose of the Sherman Act and, by extension, the Valentine Act, is to protect competition and the market as a whole, not individual competitors." *Care Heating & Cooling, Inc. v. Am. Std., Inc.*, 427 F.3d 1008, 1014 (6th Cir.2005). The foundation of an antitrust claim is the alleged adverse effect on the market. *Id.* Accordingly, an "[i]ndividual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act." *Id.* An antitrust claim will not succeed if it is "based upon nothing more than injuries allegedly suffered by a

- 5 -

competitor, rather than on harm to competition in the relevant market." *Baseball at Trotwood, LLC v. Dayton Prof. Baseball Club, LLC*, 113 F.Supp.2d 1164, 1172 (S.D.Ohio 1999).

{¶ 20} The trial court found that Clark Dietrich failed to prove harm to competition or antitrust injury and therefore failed to prove all the elements of the Valentine Act claim. In so doing, the trial court found:

> * * * There is no evidence that Clark Dietrich was prevented from selling its EQ coated products or that customers were prevented from buying them. SSMA certification is not required to prove a product is IBC compliant, nor is it necessary to market and sell NSSF products. Clark Dietrich was free to counter the statements of the Defendants and to talk to and educate the architects and specifiers about EQ coated products and to request that the EQ coated products be added to the specifications. The fact that the architects or specifiers may choose to specify other products instead of Clark Dietrich's products does not create an antitrust violation. To the extent that the Defendants [sic] statements were false or misleading, Clark Dietrich may be able to prove other claims, but not an antitrust claim.

{¶ 21} Based on our review, we agree with the trial court's decision. The record does not support an antitrust claim. In *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284 (5th Cir.1988), a manufacturer of oil well equipment sued the American Petroleum Institute (API), alleging the API excluded it from the market by delaying trade standard certification to its equipment. Similar to the present case, API was a standard-setting body that granted manufacturers a license to display its monogram on the manufacturer's equipment if the API found that the equipment satisfied its standards. *Id.* at 286.

{¶ 22} The plaintiff in *Consolidated* applied for, and was denied, a license to use API's monogram and filed suit under the Federal Sherman Act. *Id.* at 288. The trial court granted summary judgment on that claim and the Sixth Circuit affirmed. In so doing, the

Sixth Circuit held that "a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations," does not violate the Sherman Act by unfavorably evaluating a manufacturer's product. *Id.* at 292. The court noted that: (1) API approval was not required by law and equipment was frequently sold without it, and (2) consumers were in no way constrained from buying the plaintiff's products. *Id.* at 296. As a result, the manufacturer was not excluded "in a real sense" from the market because it was still free to sell its products and consumers were free to buy them. *Id.* at 292. The court emphasized that manufacturers of equipment still had the ability, even without an API monogram, to market the quality of their products. *Id.* at 296.

{¶ 23} The *Consolidated* decision has been followed by a number of courts. *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir.1989). In *Schachar*, the plaintiffs were ophthalmologists who performed a surgical procedure labeled "experimental" by the National Advisory Eye Council. *Id.* The American Academy of Ophthalmology endorsed the Council's position and issued a press release advising physicians and patients not to use the procedure until more research had been completed. *Id.* The plaintiffs alleged that the press release was part of a conspiracy to restrain trade. *Id.*

{¶ 24} The Seventh Circuit held that there was no violation of the Sherman Act because there was no enforcement device that operated to restrain trade. *Id.* at 400. None of the plaintiffs were prevented from doing the procedure or sanctioned for performing it. *Id.* at 398. The court characterized the challenged action as "warfare among suppliers and their different products," not as restraint, but as competition. *Id.* at 399.

> *Consolidated Metal Products, Inc.* * * * holds that when a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws. We agree. An organization's towering reputation does not reduce its freedom to speak out. Speech informed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor. The

Academy's declaration affected only the demand side of the market, and then only by appealing to consumers' (and third-party payors') better judgment. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech – the marketplace of ideas.

*Id.* at 399-400 (citations omitted).

{¶ 25} More recently, this analysis was followed in *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123 (3d Cir.2005). In *Santana*, a toilet partition manufacturer sued its competitor, Bobrick, alleging that Bobrick gave architects false information about Santana's products to coerce or convince architects to specify Bobrick's product rather than Santana's product. *Id.* at 127-128. There was no dispute that the defendants in the case informed customers that Santana's products posed a safety hazard. *Id.* at 132.

{¶ 26} However, in affirming summary judgment in favor of the defendant on the antitrust claims, the Third Circuit found that the manufacturer was not excluded "in a real sense" from the market because Santana was still free to sell its products and consumers were still free to buy them. *Id.* at 133. The architects made the ultimate decision on which products to specify and jockeying over specifications is a valid form of competition. *Id.* "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation." *Id.* at 134. Absent an enforcement device that restrained trade and prevented plaintiff from selling or customers from buying its products, there is no antitrust violation.

{¶ 27} In contrast, Clark Dietrich relies on several cases, including *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S. Ct. 1931 (1998), to argue that private standard-setting organizations may be held liable for enacting anticompetitive standards. However, *Allied Tube* is distinguishable. Here, the relevant standard is the IBC

and approval of the SSMA was one method of showing compliance with the IBC. Unlike the situation in *Allied Tube*, the SSMA does not set, adopt, or enforce the industry standard. Furthermore, the court in *Allied Tube* was specifically determining whether *Noerr* immunity applied to a private organization and does address antitrust liability governing such organizations:

> Although we do not here set forth the rules of antitrust liability governing the private standard-setting process, we hold that at least where, as here, an economically interested party exercises decision making authority in formulating a product standard for a private association that comprises market participants, that party enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace.

*Id.* at 509-510.[2] While it is true that private standard-setting organizations may be liable for enacting anticompetitive standards, Clark Dietrich does not cite any analogous case to support its position based on these particular facts.

**{¶ 28}** The trial court found a number of undisputed facts related to the Valentine Act. As the parties do not dispute these facts, we will summarize them below:

> In most cases, specifications for commercial building projects are developed by design professionals, i.e., architects or specification writers contracted by the architects. These specifications detail the products and materials acceptable for use on a particular construction project.
>
> The specifications may list manufacturers, code requirements, industry groups, or in some cases may list a particular company's products.
>
> Companies in the industry are free to lobby or work to persuade architects and specifiers to educate them about products and to persuade them to include the company's products in job specifications.
>
> The SSMA is a voluntary trade organization and membership in

---

2. The *Noerr* doctrine shields certain political actions from the Sherman Act, recognizing that the antitrust laws, "tailored as they are for the business world, are not at all appropriate for application in the political arena." *E. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523 (1961); *See United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (1965).

the SSMA is not required in order to sell NSSF products.

There are competitors in the industry who are not members of the SSMA.

The SSMA has a certification program that allows manufacturers to demonstrate that their products are compliant with the IBC.

SSMA membership and the SSMA compliance program are not necessary to manufacture products that comply with the IBC and are not the only way to show compliance with the IBC.

In 2010, SSMA created a task force to develop an IBC compliance program. The draft program did not contain an elongation requirement relating to the rigidity of steel. Instead, the draft program contained a coatings standard that G40EQ products would satisfy.

Upon submission of the draft to the SSMA Board of Directors, an elongations requirement and more restrictive coatings standards were adopted. The new elongation requirement would not affect members using prime steel, but would affect those using secondary steel and the processes utilized in the production of G40EQ products.

SSMA members were required to comply with the new standards. Therefore, Clark Dietrich resigned in March 2011 and formed an alternative trade association. At the time of their resignation, Clark Dietrich has a combined market share of 46%.

{¶ 29} As in *Consolidated* and *Schacher*, this matter involves a trade association that adopted standards unfavorable to the complaining party. Here, Clark Dietrich complains that the "sham standards" adopted by the SSMA amounted to a violation of the Valentine Act. In support of its position, Clark Dietrich presented the testimony of its expert, James Kearl. In his deposition, Kearl acknowledged that Clark Dietrich was not prevented from selling its G40EQ products and customers were not prevented from purchasing them. In addition, Kearl noted that SSMA certification was not required to prove that the product was IBC compliant. Rather, Kearl's position is that there was an antitrust violation because:

(1) If Clark Dietrich had been granted this certification it could have competed effectively with rivals,

(2) As the innovative technology was produced at a lower cost, Clark Dietrich would have had a higher margin of return on its product,

(3) Clark Dietrich's competitors would invest in this technology to also achieve the higher margin of return,

(4) Therefore, the failure to grant this certification was an injury to competition because the industry did not adopt technology that would ultimately lower the cost of the innovative technology

**{¶ 30}** We have reviewed the record, including the testimony of Clark Dietrich's expert, Kearl, and conclude the trial court did not err by granting summary judgment in favor of SSMA. Aside from being speculative, Kearl's testimony does not raise any genuine issue of material fact as to the Valentine Act claim. There is no evidence that Clark Dietrich was prevented from selling its G40EQ product or that customers were prevented from purchasing those products on the open market. While it is undisputed that the standards adopted by the SSMA prevented Clark Dietrich from manufacturing its G40EQ products as an approved SSMA product, such action does not amount to a restraint on trade. As addressed earlier, SSMA certification is not required to prove that the product is IBC compliant, nor was it a requirement that Clark Dietrich be a member of the association. Similar to *Santana*, Clark Dietrich was free to continue selling its G40EQ products and educate architects and specifiers about the benefit of their products. As noted by the court in *Consolidated*, "[a] plaintiff does not have a claim under the rule of reason simply because others refuse to promote, approve, or buy its products." *Consolidated*, 846 F.2d at 293.

**{¶ 31}** As a result, we find the trial court did not err by granting summary judgment on the Valentine Act claim. Therefore, Clark Dietrich's sole assignment of error is without merit and is hereby overruled.

**{¶ 32}** Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.