[Cite as *Evans v. Gardner*, 2026-Ohio-690.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| CATHERINE L. EVANS, RECEIVER, ON BEHALF OF CERTIFIED STEEL STUD ASSOCIATION, INC., | : | CASE NOS. CA2025-02-020 |
| | : | CA2025-02-021 |
| Appellant, | : | |
| | : | OPINION AND |
| vs. | : | JUDGMENT ENTRY |
| | | 3/2/2026 |
| WILLIAM A. GARDNER, et al., | : | |
| Appellees. | : | |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV 2018 02 0442


Helmer, Martins, Tate & Garrett Co., LPA, and B. Nathaniel Garrett, James A. Tate, and Paul B. Martins; and Millikin & Fitton Law Firm, and Steven A. Tooman, for appellant, Catherine L. Evans, Receiver.

Frost Brown Todd LLP, and Matthew C. Blickensderfer; and Dentons Cohen & Grigsby, P.C., Anthony Cillo, and Fridrikh V. Shrayber, for appellant, ClarkWestern Dietrich Building Systems LLC.

Taft Stettinius & Hollister LLP, and Daniel R. Warncke, Aaron M. Herzig, and Nathan R. Coyne; and Pollock Law, LLC, and Jeffrey M. Pollock, for appellee, William A. Gardner.

Dinsmore & Shohl LLP, and Peter J. Georgiton and Justin M. Burns; and Chamberlain Hrdlicka White Williams & Aughtry, and Scott M. Ratchick and John C. Guin, for appellee, Edward R. Slish.

## **O P I N I O N**

**BYRNE, J.**

{¶ 1}  Plaintiff, court-appointed Receiver Catherine L. Evans, and Interested Party, Clarkwestern Dietrich Building Systems LLC, appeal the decision of the Butler County Court of Common Pleas, General Division, which denied the Receiver's motion for summary judgment and granted the motions for summary judgment filed by Defendants William A. Gardner and Edward R. Slish. For the reasons discussed below, we affirm.

### I.  Factual and Procedural Background

{¶ 2}  This case arises from a dispute between competitors in the steel framing products industry. The dispute led to litigation and a more than $40 million dollar judgment against a trade association. This case involves efforts to collect that judgment through a receivership action.

### A.  Formation of the Certified Steel Stud Association

{¶ 3}  In 2012, three steel framing product manufacturers, Ware Industries, Inc. ("Ware"), California Expanded Metal Products Company ("CEMCO"), and Telling Industries, LLC ("Telling") formed the Certified Steel Stud Association, Inc. ("CSSA"). The CSSA was formed under IRS Revenue Code 501(c)(6) as a nonprofit, nonstock mutual benefit corporation recognized as a tax-exempt business league. The CSSA is a Delaware corporation. According to its bylaws, the CSSA's "objectives and purposes" were to, among other things,

> provide members with an independent organization of
> industry members to permit coordinated compliance with
> building codes applicable to them. The corporation shall
> establish standards that can be certified by an independent

third party certification service such as the International Code Council Evaluation Services ("ICC-ES") to permit members to conform to current and evolving building code standards.

{¶ 4} Pursuant to its bylaws, full voting membership in the CSSA was limited to those involved in the steel stud manufacturing industry. The CSSA's bylaws further provided that its governing body would be the Board of Directors, elected by the full members of the CSSA. Any representative of the full members would be eligible to serve as a member of the Board of Directors.

{¶ 5} The CSSA's initial directors were high-level employees of each of the three companies that formed the CSSA, as follows:

| | |
|---|---|
| Chairman | Defendant-appellee William A. Gardner ("Gardner") |
| Vice Chair | Tom Porter |
| Secretary/Treasurer | Defendant-appellee Edward R. Slish ("Slish") |

Gardner was the Chief Executive Officer of Ware. Porter was the Vice President of CEMCO. Slish was the President of Telling.

### B. Background Information on Steel Coatings

{¶ 6} Manufacturers of nonstructural steel framing ("NSSF") products coat these products with a zinc-based coating called "G40." They apply this coating to comply with certain building standards set forth in the International Building Code ("IBC") that relate to ensuring that these products are noncombustible and corrosion-resistant.

{¶ 7} Clarkwestern Dietrich Building Systems LLC, dba ClarkDietrich ("ClarkDietrich"), is also a steel stud manufacturer, and a direct competitor to two of the companies in the CSSA (Ware and Telling). In 2010, ClarkDietrich developed a new NSSF product, which it coated with a proprietary coating that it called "EQ" or "G40EQ." *Clarkwestern Dietrich Bldg. Sys., L.L.C. v. Certified Steel Stud Assn., Inc.*, 2017-Ohio-1091, ¶ 6 (12th Dist.). ClarkDietrich claimed that the "EQ" coating was an equivalent

coating to "G40" and provided equal or better corrosion resistance as the standard G40 coating. *Id*. ClarkDietrich was able to produce its alternative NSSF product at a lower cost than its steel industry competitors could produce traditional G40-coated NSSF products, which gave it a competitive advantage. *Id*. at ¶ 7.

### C.  The CSSA Article on EQ Coatings

{¶ 8}  After its formation, the CSSA released a publication entitled "CSSA Opinion: EQ Coatings Are Not Recognized by The Code." The article claimed, among other things, that EQ coatings were not compliant with the IBC because EQ coatings were not listed in a certain IBC table specifying acceptable coatings. The article also suggested that the use of EQ-coated products could result in liability for any contractors using those products. The article further suggested that manufacturers who sold EQ products were in the business of substituting EQ-coated framing products on projects that called for the use of G40 coatings, without informing the customer.

{¶ 9}  The CSSA's article on EQ coatings was published to a wide audience involved in the industry. ClarkDietrich claimed that it lost projects and millions of dollars in revenue after—and as a result of—the article's publication.

### D.  The Defamation Action and the Antitrust Action

{¶ 10} In 2013, ClarkDietrich filed a defamation action against the CSSA and its three members companies ("the Defamation Action") in the Butler County Court of Common Pleas. ClarkDietrich alleged that the EQ coatings article published by the CSSA defamed it and sought substantial damages.

{¶ 11} ClarkDietrich also filed a parallel suit in the Butler County Court of Common Pleas against a different trade association (the Steel Stud Manufacturing Association ["SSMA"]), the CSSA, and various manufacturers, including the three member companies

of the CSSA. This suit alleged antitrust violations of the Ohio Valentine Act ("the Antitrust Action"). The Antitrust Action involved the creation, by the SSMA, of an IBC compliance program for NSSF products, the purpose of which was (as alleged by ClarkDietrich) to force ClarkDietrich to stop producing its EQ products. *Clarkwestern*, 2017-Ohio-1091, at ¶ 8. ClarkDietrich, which was an SSMA member, resigned from the organization and asserted the Antitrust Action. Eventually, the Antitrust Action was resolved when the common pleas court granted summary judgment in favor of the SMMA, finding that ClarkDietrich had not presented evidence of an actionable claim under the Ohio Valentine Act. *Id*. at ¶ 11.

{¶ 12} In 2015, the Defamation Action went to trial. During the course of the trial, ClarkDietrich settled with each of the CSSA's three member companies, leaving only the CSSA as a defendant. After approximately 11 weeks of trial, and just before closing arguments, ClarkDietrich offered to dismiss its claims against the CSSA with prejudice. That is, ClarkDietrich offered CSSA a walk-away, no-cost settlement offer. The CSSA had no counterclaims against the ClarkDietrich so this dismissal offer would have ended the case. But because trial had commenced, ClarkDietrich could not dismiss the case without the CSSA's agreement or a court order. Civ.R. 41(A)(1) and (2).

{¶ 13} The CSSA Board of Directors—consisting at that time of Gardner, Porter, Slish and one additional director, Henri Jung—discussed the settlement offer on a conference call and voted to reject the offer.[1] After this refusal, ClarkDietrich moved the trial court for an order dismissing its case against the CSSA. The CSSA directors also

---

1. Jung was a representative of Phillips Manufacturing, which joined the CSSA in 2014 or 2015, after the publication of the article and after the filing of the Defamation Action. Phillips Manufacturing was not a co-defendant in the Defamation Action. Jung did not vote on the settlement offer issue; Gardner had Jung's proxy and voted "no" on his behalf. The parties have argued whether this proxy was valid, but that issue is not relevant to deciding this appeal so we need not discuss it further.

decided to oppose this motion.

{¶ 14} At a hearing the next morning, counsel for CSSA, John Hust, explained the CSSA's reasoning for opposing ClarkDietrich's motion to dismiss. Part of that reasoning was that ClarkDietrich, in offering to dismiss the Defamation Action, would not agree to also forego an appeal of the Antitrust Action. Hust explained that the CSSA was concerned that the Antitrust Action could be appealed and remanded for a trial and that many of the same issues that could be resolved in the Defamation Action would have to be relitigated in a revived Antitrust Action. Hust stressed the time and effort that had gone into the Defamation Action trial and that "this is the chance to end it on this issue" and that "the organization wants a decision."

{¶ 15} The trial court denied ClarkDietrich's motion to dismiss. Thereafter, the trial proceeded to closing arguments. Afterwards, a unanimous jury found for ClarkDietrich in the amount of $49.5 million dollars. The CSSA was ultimately responsible for $43 million of that amount.

{¶ 16} But the CSSA only held sufficient assets to pay its limited operating costs and could not satisfy this substantial judgment. ClarkDietrich thereafter moved the trial court to appoint a receiver on the CSSA's behalf to pursue potential breach-of-fiduciary-duty claims against the CSSA's four individual directors, to obtain funds to satisfy the judgment against the CSSA. The trial court agreed and appointed John Reister as the Receiver of the CSSA for the limited purpose of investigating and pursuing breach of fiduciary duty claims. After Reister retired, the court substituted Catherine Evans as the Receiver.

### E. The Receiver Brings Claims Against the Four Directors

{¶ 17} In 2018, the Receiver initiated the litigation which is the subject of this

appeal ("the Receivership Action"). The Receiver's complaint stated claims for breach of fiduciary duty and declaratory judgment against the four CSSA directors: Gardner, Slish, Porter, and Jung. The Receiver also named ClarkDietrich as an interested party.

{¶ 18} The complaint alleged that in rejecting the settlement offer, the CSSA's four directors breached their fiduciary duty to the CSSA, resulting in money damages. The complaint also asked for a declaratory judgment that the directors failed to exercise appropriate business judgment and their decision to oppose the settlement offer was not entitled to protection under the business-judgment rule. During the proceedings, Porter and Jung settled with the Receiver and were dismissed from the case.

{¶ 19} The remaining two director-defendants, Gardner and Slish, moved for judgment on the pleadings, arguing that their actions in rejecting the settlement offer were protected by the litigation privilege. The common pleas court agreed that the litigation privilege applied and granted Gardner's and Slish's motions. On appeal, this court affirmed. *Reister v. Gardner*, 2019-Ohio-4720, ¶ 29 (12th Dist.).

{¶ 20} The Receiver and ClarkDietrich then appealed to the Ohio Supreme Court. The Ohio Supreme Court reversed and held that the litigation privilege was inapplicable and remanded the case. *Reister v. Gardner*, 2020-Ohio-5484, ¶ 14, 21. The Ohio Supreme Court noted that the business-judgment rule may apply to shield the directors' actions but that it was premature to say whether it would apply. *Id*. at ¶ 19. The supreme court also clarified that because the CSSA was a Delaware corporation, the court would look to Delaware law to define the directors' fiduciary duties and the applicability of the business-judgment rule. *Id*. at ¶ 11.

{¶ 21} On remand, Gardner moved to dismiss ClarkDietrich from the Receivership Action, arguing that ClarkDietrich was not an "interested party" under R.C. 2721.12. The

common pleas court dismissed ClarkDietrich from the Receivership Action, but on appeal we reversed that decision and reinstated ClarkDietrich as an interested party. *Reister v. Gardner*, 2022-Ohio-4272, ¶ 12-16, 41-42, 47 (12th Dist.).

{¶ 22} Later, in 2024, Gardner and Slish each moved the common pleas court for summary judgment. In their motions, Gardner and Slish argued that the Receiver had failed to identify any conflict of interest between Gardner, Slish, and the CSSA and had therefore not overcome the presumption, under Delaware's business-judgment rule, that they rejected the settlement offer in good faith.

{¶ 23} The Receiver also moved for summary judgment, arguing that Gardner and Slish were not acting in the CSSA's best interest in rejecting ClarkDietrich's settlement offer in the Defamation Action, but were instead serving only the interests of their respective employers, Ware and Telling. The Receiver argued that because Gardner and Slish were disloyal to the CSSA, the presumption that the business-judgment rule applied had been rebutted and the directors' actions should be scrutinized under Delaware's more onerous "entire fairness" standard. Under this standard, the Receiver argued that Gardner and Slish could not establish that rejecting the settlement offer was "entirely fair" to the CSSA.

{¶ 24} The common pleas court issued a written decision granting Gardner's and Slish's motions for summary judgment and denying the Receiver's motion for summary judgment. The court determined that the business-judgment rule applied and that the Receiver had failed to rebut the presumption that Garder and Slish acted in good faith and with due care. The common pleas court found that the Receiver had provided no evidence that either director had a conflict of interest or lacked independence in their decision-making with regard to rejecting the settlement offer.

{¶ 25} The court noted that Gardner and Slish, in rejecting the offer, had independent conversations with the CSSA's attorney, who believed that there was a 60% chance of winning a defense verdict. The common pleas court also found that rejecting the settlement offer was consistent with the CSSA's objective in the litigation of resolving the issue of whether ClarkDietrich's EQ products were code-compliant.

{¶ 26} The common pleas court rejected the argument that Gardner and Slish lacked independence because they served dual roles as both CSSA directors and employees of CSSA's member companies. The court found that the CSSA was a trade association and was formed to serve the interests of its members. The court found that the CSSA and its member companies were aligned as a matter of law and that rejecting the settlement offer was in furtherance of the CSSA's bylaws, which related to compliance with building codes and advocating for its members' needs in the judicial system.

{¶ 27} The common pleas court further found that even if the business-judgment rule did not apply, the decision to reject the settlement offer would have passed muster under the "entire fairness" standard. The court noted that the CSSA was essentially formed to force compliance with its interpretation of the IBC and that it was consistent with this purpose to let the jury decide the issue because of the CSSA's belief that ClarkDietrich was not in code compliance with its EQ products. The court also noted that the CSSA was judgment-proof and had nothing to lose by proceeding to a verdict. In addition, and as stated before, the directors believed that they had a 60 percent chance of a defense verdict.

{¶ 28} The Receiver and Clark Dietrich appealed, each raising two essentially identical assignments of error. We address their assignments of error together.

**II. Law and Analysis**

{¶ 29} The Receiver's first assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT FOR THE CSSA DIRECTORS.

{¶ 30} ClarkDietrich's first assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT FOR DEFENDANTS GARDNER AND SLISH.

{¶ 31} The Receiver and ClarkDietrich argue that the common pleas court erred in granting summary judgment in favor of Gardner and Slish. The Receiver points to various facts in the record that she argues support the conclusion that in rejecting the settlement offer, Gardner and Slish were working to advance their employers' anti-competitive interests and were not working to advance CSSA's welfare. The Receiver argues this summary judgment evidence demonstrated that Gardner and Slish violated their duty of loyalty to the CSSA, and thus, the common pleas court erred in applying the business-judgment rule to the Receiver's claims against Gardner and Slish. The Receiver further argues that the correct standard of review for reviewing the directors' actions was not the business-judgment rule, but rather, the "entire fairness" standard. ClarkDietrich focuses its argument on Gardner and Slish's alleged lack of independence and the application of the "entire fairness" standard.

{¶ 32} As described in the previous paragraph, the Receiver and ClarkDietrich in their respective briefs present many of the same arguments in support of reversing the trial court's decision. We address the Receiver's and ClarkDietrich's arguments together in this opinion, but for ease of reading, we will only refer to the Receiver when describing the Receiver's and ClarkDietrich's collective arguments.[2]

---

2. To be clear, we have considered all arguments raised by all parties with respect to all assignments of error. We specifically respond to those arguments here to the extent they require a specific response in the context of our overall analysis, which is dispositive of all arguments made by the parties.

**A. Applicable Law**

{¶ 33} Before addressing the parties' arguments, we must address the question of which state's law applies, the applicable standards of review, and the contours of the business-judgment rule and the entire-fairness standard.

**1. Which State's Law Applies?**

{¶ 34} In an earlier appeal in this Receivership Action, the Ohio Supreme Court explained that because the CSSA is a Delaware corporation, Delaware state law applies to questions involving the directors' fiduciary duties and the business-judgment rule. *Reister v. Gardner*, 2020-Ohio-5484, ¶ 11. We therefore apply Delaware law to those issues in this appeal.

{¶ 35} In that earlier appeal, the Ohio Supreme Court applied Ohio procedural law. *Id*. at ¶ 17. We therefore apply Ohio procedural law regarding summary judgment in our review of the common pleas court's summary judgment decision.

{¶ 36} The trial court's summary judgment decision noted that the parties agreed that Delaware would control the "substantive" law and Ohio law applied "elsewhere." That finding has not been challenged on appeal.

**2. Ohio's Summary Judgment Standard of Review**

{¶ 37} "Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial." *Franchas Holdings, L.L.C. v. Dameron*, 2016-Ohio-878, ¶ 16 (12th Dist.), citing *Roberts v. RMB Ents. Inc.*, 2011-Ohio-6223, ¶ 6 (12th Dist.).

{¶ 38} "Civ.R. 56 sets forth the summary judgment standard." *State ex rel. Becker v. Faris*, 2021-Ohio-1127, ¶ 14 (12th Dist.). "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2)

- 11 -

the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frisch's Restaurants, Inc.*, 2021-Ohio-1913, ¶ 6 (12th Dist.), citing *BAC Home Loans Servicing, L.P. v. Kolenich*, 2011-Ohio-3345, ¶ 17 (12th Dist.). "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 2010-Ohio-2961, ¶ 9 (12th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 39} The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Vesper v. Otterbein Lebanon*, 2021-Ohio-4545, ¶ 23 (12th Dist.); *Touhey v. Ed's Tree & Turf, L.L.C.*, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 1996-Ohio-107, ¶ 17. The moving party "must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment." *Kelley v. Dayton Pub. Schools Bd. of Edn.*, 2024-Ohio-979, ¶ 21, (2d Dist.), citing *Dresher* at ¶ 17. Once the moving party meets this burden, the nonmoving party has a reciprocal burden requiring it to present evidence to demonstrate that there is some issue of material fact yet remaining to be resolved. *Smedley v. Discount Drug Mart, Inc.*, 190 Ohio App.3d 684, 2010-Ohio-5665, ¶ 11 (12th Dist.). The nonmoving party does this by presenting "'specific facts,'" demonstrating the existence of a genuine triable issue; the nonmoving party "'may not rest on the mere allegations or denials in its pleadings.'" *Oliphant v. AWP, Inc.*, 2020-Ohio-229, ¶ 31 (12th Dist.), quoting *Deutsche Bank Natl. Trust Co. v. Sexton*, 2010-Ohio-4802, ¶ 7 (12th Dist.), citing Civ.R. 56(E). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium*, 2019-Ohio-447, ¶ 10 (12th Dist.), citing *Puhl v. U.S. Bank, N.A.*, 2015-Ohio-2083, ¶ 13 (12th Dist.). "In determining whether a

genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Assured Admin., L.L.C. v. Young*, 2019-Ohio-3953, ¶ 14 (12th Dist.), citing *Vanderbilt v. Pier 27, L.L.C.*, 2013-Ohio-5205, ¶ 8, (12th Dist.).

{¶ 40} Under Ohio law, an appellate court reviews a trial court's decision on a motion for summary judgment de novo, independently, and without deference to the trial court's decision. *Davis v. Royal Paper Stock Co., Inc.*, 2022-Ohio-4135, ¶ 56 (12th Dist.); *Wulf v. Bravo Brio Restaurant Group, Inc.*, 2019-Ohio-3434, ¶ 15 (12th Dist.).

**B. Delaware's Standards of Review of Director Fiduciary Obligations**

{¶ 41} As explained above, the common pleas court granted summary judgment to Gardner and Slish, and denied summary judgment to the Receiver, based on its application of Delaware's business-judgment rule to the Receiver's claims against the directors for breach of fiduciary duty.

{¶ 42} "Delaware has three tiers of review for evaluating director decision-making: [(1)] the business judgment rule, [(2)] enhanced scrutiny,[3] and [(3)] entire fairness." *In re Trados Inc. Shareholder Litigation*, 73 A.3d 17, 43 (Del.Ch.2013), quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del.Ch. 2011). The business-judgment rule is the "default standard of review." *Id.* at 43.

{¶ 43} The business-judgment rule "presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Id.*, quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). This standard "'reflects and promotes the role of

---

3. Enhanced scrutiny is an intermediate level of review that applies only in certain situations, such as a hostile takeover or the sale of a corporation. *In re Trados*, 73 A.3d at 43-44. Enhanced scrutiny is not applicable in this case.

the board of directors as the proper body to manage the business and affairs of the corporation.'" *Id*. quoting *In re Trados Inc. Shareholder Litigation*, 2009 WL 2225958, *6 (Del.Ch. July 24, 2009). Unless an element of the business-judgment rule is rebutted, a reviewing court "'merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives.'" *Trados*, 73 A.3d at 43, quoting *In re Dollar Thrifty Shareholder Litigation*, 14 A.3d 573, 598 (Del.Ch.2010). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id.*

{¶ 44} To rebut the presumptive applicability of the business judgment rule, "a shareholder plaintiff has the burden of proving that the board of directors, in reaching its challenged decision, violated any one of its triad of fiduciary duties: due care, loyalty, or good faith."[4] *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del.2001). "If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule operates to provide substantive protection for the directors and for the decisions that they have made." *Id*. "If the presumption of the business judgment rule is rebutted, however, the burden shifts to the director defendants to prove to the *trier of fact* that the challenged transaction was 'entirely fair' to the shareholder plaintiff" under Delaware's entire-fairness standard of review. (Emphasis in original.) *Id.*[5]

{¶ 45} A court's application of the business-judgment rule under Delaware law,

---

4. Though the Receiver is not a shareholder of the CSSA, the common pleas court appointed the Receiver specifically to pursue breach of fiduciary duty claims that would in other circumstances have been brought by a shareholder of the CSSA.

5. "Entire fairness" is Delaware's most demanding standard of review and applies when a board made decisions under "actual conflicts of interest." *Trados*, 73 A.3d at 44. To obtain entire-fairness review, a plaintiff must prove that there were not enough "independent and disinterested" individuals among the directors making the challenged decision to comprise a board majority. *Id*. In reviewing whether the directors were disinterested, a court conducts a director-by-director analysis. *Id*.

including the court's consideration of the duty of loyalty and duty of care standards under the business-judgment rule, involves questions of law, and thus the court's decision is subject to de novo review on appeal. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del.1993).

### C. Analysis: Did the Receiver Present Summary Judgment Evidence Rebutting the Business-Judgment Rule?

**{¶ 46}** On appeal, the Receiver argues that after Gardner and Slish met their initial summary judgment burden, she presented summary judgment evidence that Gardner and Slish violated their duty of loyalty and good faith[6] to the CSSA.[7] The Receiver argues that Gardner and Slish violated their duty of loyalty by voting to reject the settlement offer, in furtherance of their own employers' interests, and subjected the CSSA to the risk of substantial liability if the jury found for ClarkDietrich.

**{¶ 47}** The business-judgment rule presumption that a board acted loyally and in good faith can be rebutted by facts which establish that (1) a majority of the board was financially interested in the outcome of the transaction or (2) a majority of the board was dominated or controlled by a materially interested director. *Orman v. Cullman*, 794 A.2d 5, 22 (Del.Ch.2002).[8] This second means of demonstrating disloyalty is shown when a majority of the board "lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders." *Id*.

**{¶ 48}** As to the first means—financial interest—the common pleas court found,

---

6. "Good faith" is a subsidiary element of the duty of loyalty. *Stone ex rel. Amsouth Bancorporation v. Ritter*, 911 A.2d 362, 369-370 (Del.2006).

7. The Receiver does not argue that Gardner and Slish violated a duty of care.

8. Typically a *majority* of the board of directors is the key to this analysis. Delaware courts have recognized situations in which a *minority* of directors is sufficient, but that scenario is not applicable here and need not be considered. *Orman* at 22.

and we agree, that the summary judgment record is devoid of any evidence suggesting that Gardner or Slish received any personal financial benefit by voting to reject the settlement offer. The Receiver also does not argue on appeal that Gardner or Slish received any financial benefit from voting to reject the settlement offer.

{¶ 49} The Receiver's argument instead concerns the second means, i.e., that Gardner and Slish were disloyal to the CSSA because in voting to reject the settlement offer they were only considering the best interests of Ware and Telling. That is, the Receiver is arguing that Gardner and Slish lacked independence and were "dominated or controlled" by their respective employers, whose interests were not aligned with the CSSA's interests. *Orman*, 794 A.2d at 22. *See Manti Holdings, L.L.C. v. Carlyle Group, Inc.*, 2025 WL 39810, *24 (Del.Ch.2025) (holding that director's decisions are only reviewed under the entire-fairness standard if the director lacks "independence from a conflicted controller."). A plaintiff can rebut the presumptive application of the business-judgment rule where the facts demonstrate that a director was a "dual fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders." *In re McDonald's Corp. Stockholder Derivative Litigation*, 291 A.3d 652, 687 (Del.Ch. 2023).

{¶ 50} Upon review, we conclude that Gardner and Slish did not lack independence and were not conflicted, as a matter of law, in voting to reject ClarkDietrich's settlement offer. While Gardner and Slish had dual loyalties with respect to the CSSA and their respective employers, the summary judgment record supports the conclusion that the CSSA and its member companies were aligned with respect to the decision to reject the settlement offer and proceed to a jury verdict.

{¶ 51} The corporate structure and bylaws of the CSSA are critical to this analysis.

The record reflects that CSSA is a nonprofit, nonstock, tax-exempt business league and mutual benefit corporation, registered under Section 501(c)(6) of the Internal Revenue Code. A Section 501(c)(6) business league is an organization created to promote the *common business interests* of its members. 26 C.F.R. 1.501(c)(6)-1. A business league's "activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons." *Id*.

{¶ 52} Consistent with these regulations, the stated purpose of the CSSA, as set forth in its Delaware Certificate of Incorporation, was to "promote the business interests of manufacturers of steel studs." The CSSA bylaws further stated that the "objectives" of the corporation were:

> (1) To provide members with an independent organization of industry members to permit coordinated compliance with building codes applicable to them. The corporation shall establish standards that can be certified by an independent third party certification service such as the International Code Council Evaluation Services ("ICC-ES") to permit members to conform to current and evolving building code standards.
>
> (2) To provide members and others with a forum to discuss technical issues involving industry products, with such discussions to be based upon the technical merits of the products;
>
> (3) To articulate and advocate the needs and interests of the members' industry, before legislative, administrative, regulatory and judicial branches of local, state, and national governments;
>
> (4) To promote cooperation among its members and others, both directly and through other corporations in matters involving the business and governmental affairs of the corporation; and
>
> (5) To undertake such other programs or such other activities as may be necessary and proper to enhance and promote the welfare of the Cold-Formed Steel Framing Systems industry

as determined by the Board of Directors.

{¶ 53} The CSSA bylaws further restricted full membership in the CSSA to companies that were in the business of manufacturing by roll forming cold-formed steel studs, and related items, and who sold to the residential and/or commercial construction markets.

{¶ 54} In sum, the purpose of the CSSA was to coordinate code compliance between member companies and to "promote" the business interests of its member companies, including, critically, "*advocat[ing] the needs and interests of the members' industry, before . . . judicial branches of local, state, and national governments.*" (Emphasis added.)

{¶ 55} The CSSA's bylaws establish that it operated in the nature of a mutual benefit corporation and such corporations are "'formed primarily to serve their members.'" Mary A. Jacobson, *Nonprofit Corporations: Conversion to for-Profit Corporate Status and Nonprofit Corporation Members' Rights -- Farahpour v. Dex, Inc.*, 20 Del. J. Corp. L. 635, 638 (1995), quoting Thomas H. Boyd, *A Call to Reform the Duties of Directors Under State Not-for-Profit Corporation Statutes*, 72 Iowa L. Rev. 725, 730 (1987). Consistent with the understanding that mutual benefit corporations serve their members, Delaware law supports the conclusion that "[t]he directors of a non-profit membership corporation have a duty to act in the *best interest of the corporation's members*. . . ." (Emphasis added.) *Baring v. Watergate East, Inc.*, 2004 Del.Ch. LEXIS 17, *6 (Del.Ch.2004).

{¶ 56} Delaware law supports the conclusion that there is no conflict between the directors' dual loyalties in a case with facts like those here. Delaware courts hold that there is "'no dilution'" of the duty of loyalty when a director "'holds dual or multiple'" fiduciary obligations. *Trados*, 73 A.3d at 46-47, quoting *Weinberger v. UOP, Inc.*, 457 A.2d

701, 710 (Del.1983). Nevertheless, even in a dual-loyalty situation, no conflict exists if the interests of the beneficiaries to whom the fiduciary owes duties are aligned. *Id*.

{¶ 57} Based on the incorporation documents and the bylaws, Gardner's and Slish's decision to reject the settlement offer and proceed to a jury verdict was consistent with the purpose of the CSSA, which was to "promote" and serve the business interests of the CSSA's member companies. While the vote subjected the CSSA to a substantial risk, even potentially its demise, the CSSA, Ware, and Telling were aligned in their desire to achieve a favorable outcome in the Defamation Action. That is, the CSSA and its member companies, rightly or wrongly, took the position that ClarkDietrich's EQ product was not compliant with the IBC, presented safety concerns, and was negatively affecting their business interests and the steel stud industry. A defense verdict could help establish that the claims asserted in the article were substantially true and that ClarkDietrich's EQ products were not code compliant.

{¶ 58} The evidence is clear that Gardner and Slish understood that they were risking the viability of the CSSA as an ongoing organization. Gardner said as much and Hust confirmed that proceeding to a jury verdict was a considerable risk. But given the CSSA's obligation to serve its members first, the CSSA directors could decide that this gamble was warranted and authorized under the bylaws. As such, and as a matter of law, Gardner and Slish in voting to reject the settlement offer were not conflicted, but in fact aligned with the interests of the CSSA.

{¶ 59} The Receiver claims that Gardner and Slish lacked independence and points to evidence establishing that the two directors communicated frequently with their respective companies concerning the vote on the settlement offer. The Receiver argues that their votes were a product of those conversations. However, the fact that Gardner

and Slish consulted with their respective employers, which were member companies of the CSSA, is not surprising and does not demonstrate a lack of independence under the circumstances presented here. A director only lacks independence if he is controlled by a *conflicted* entity. *Manti*, 2025 WL 39810 at *24 (directors "decisions are only reviewed under entire fairness if they lack independence from a conflicted controller such that they themselves have a conflict of interest . . . "); *In re Crimson Explorations Inc. Stockholder Litigation*, 2014 WL 5449419, *21 (Del.Ch. Oct. 24, 2014) ("Because Oaktree was not conflicted, even if it appointed a majority of the Board, that fact is not relevant to determining the directors' independence or interestedness in this transaction.") As set forth above, the CSSA and its member companies were aligned and not conflicted. Because the CSSA existed to serve and promote its members' business interests, it is wholly reasonable and expected that Garder and Slish would consult with their respective companies in deciding how to respond to the settlement offer. Because the CSSA and its member companies were aligned, Gardner and Slish did not lack independence as a matter of law.

{¶ 60} The outcome of this case could be different if the CSSA was, for example, a for-profit corporation with shareholders, or a charitable organization with beneficiaries who were not the four member companies. In such a case, a decision risking the viability of the organization, to the detriment of shareholders or beneficiaries, and that would have only inured a benefit to the four member companies, could potentially establish a conflict of interest meriting entire-fairness review under Delaware law. But here, the CSSA existed to serve and promote the business interests of its members and the summary judgment record is clear that the directors' decision was in line with the member companies' interests.

{¶ 61} There is no issue of fact as to whether Gardner and Slish were financially interested in the transaction. They were not. And as a matter of law, Gardner and Slish were not conflicted in voting to reject the settlement offer because that vote was in line with the interests of the CSSA's member companies. As such, the Receiver did not meet her burden of demonstrating a genuine issue of fact for trial as to whether Gardner and Slish acted disloyally to the CSSA. Construing the evidence most strongly in the Receiver's favor, reasonable minds could only conclude that Gardner and Slish did not act disloyally. *Spitzer*, 2021-Ohio-1913 at ¶ 6; Civ.R. 56(C).

## D. Analysis: Whether the Decision to Reject the Settlement offer had a Rational Basis

{¶ 62} Because the Receiver did not meet her burden of demonstrating a genuine issue of fact for trial as to potential disloyalty by Gardner and Slish, we must apply the business-judgment rule in reviewing their decision to reject the settlement offer. Our review is therefore limited to determining "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Trados*, 73 A.3d at 43. Irrationality is a high bar. "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id*. An "irrational decision" is "'one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it'" *Id*. at fn. 18, quoting William T. Allen, Jack B. Jacobs, & Leo E. Stine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 452 (2002). So we now turn to the question of rationality.

{¶ 63} Based on the information available to Gardner and Slish at the time, the decision to reject the settlement offer and proceed to a jury verdict had a rational basis.

That rational basis is supported by the summary judgment evidence concerning the discussions between the directors and Hust, and other information supplied to the directors prior to the vote.

{¶ 64} The record reflects that ClarkDietrich's attorney emailed Hust (the CSSA's attorney) the settlement offer at approximately 8:00 p.m. on November 15, 2015. This was a Sunday night, and closing argument was set to begin the next morning. Hust immediately shared the settlement offer with the CSSA directors. At 10:00 p.m. the same evening, the directors convened a conference call to discuss the settlement offer. In his deposition, Hust described this conference call and stated that he did much of the talking. There was a lot of discussion about how well the trial had gone and CSSA's chances of winning a defense verdict. Hust told the directors he believed that the CSSA had a 60% to 66% chance of winning a defense verdict. In an email to Gardner, Hust qualified this assertion by indicating that juries are unpredictable and that the CSSA was "risking a lot" by letting a jury decide. But ultimately, Hust characterized the directors' votes as a "business decision."

{¶ 65} Hust testified that the directors also discussed whether ClarkDietrich's EQ products were code compliant and the need to have that issue resolved by a verdict. Hust explained that the directors expressed concerns about the safety of ClarkDietrich's products. Hust stated that in light of how well the trial had gone, the CSSA directors thought that the EQ coating question should be answered.

{¶ 66} In an email sent a few hours before receiving the settlement offer, Gardner told the other directors that he believed that CSSA had a 66 percent chance of winning, and only a 10 percent chance of losing. Outside of Hust's advice on the merits of the trial, Gardner had other bases to believe that the jury would find for the CSSA, including that

the CSSA article had been reviewed and edited before publication by David Musselwhite, an IBC "code-compliance expert," and by Chris Kinkade, a patent attorney.

{¶ 67} Gardner expressed that winning would be "extremely helpful" with respect to the possibility of the Antitrust Action being revived in the appellate process. That is, the CSSA's member companies were named defendants in that Antitrust Action and Gardner believed a favorable jury verdict in the Defamation Action would have a positive effect on any remand of the Antitrust Action after appeal. Hust expressed this very reason to the common pleas court in response to ClarkDietrich's motion to dismiss the case.

{¶ 68} Gardner also believed, and expressed to the other directors, that a defense verdict would "reinstate" the CSSA's reputation. He stated his belief that ClarkDietrich was deceiving the market and the "end-users" and that a verdict would "set the record straight." Gardner acknowledged that losing the Defamation Action would be the "end" of the CSSA. But he noted that the CSSA was its own corporation and no harm would befall its member companies.

{¶ 69} In his deposition, Slish explained that he felt that if the CSSA did not see the trial through to a verdict, "nothing was going to change relative to [ClarkDietrich's EQ product] that was being put in the marketplace that was not listed in the ASTM 1003 Table 1." Slish explained that this issue was one of the most compelling reasons that the discussions shifted from questioning the settlement offer to voting against it. Slish also emphasized that if the CSSA was supposed to be an "advocate" for the steel framing industry, and, if they just "folded up and went home," then they would no longer advocate for the industry.

{¶ 70} In all, the summary judgment record reflects that Gardner and Slish had a "rationally conceivable basis" for rejecting the settlement offer. *Trados*, 73 A.3d at 43.

They were informed, based on their trial counsel's advice, that the trial had gone well enough and had a greater-than-even chance of achieving a defense verdict. The directors perceived the risk of losing and its ramifications, and concluded that this risk was outweighed by the potential benefits to the member companies in establishing that the statements in the CSSA's publication were true. Finally, the directors were concerned that the settlement offer did not resolve the separate Antitrust Action. This was not a decision that is "so blatantly imprudent that it is inexplicable." *Id.* at 43, fn. 18.

{¶ 71} The Receiver argues that the directors could not claim that a defense verdict would vindicate their views about the EQ code compliance issue because the jurors in the Defamation Action were never presented with any specific interrogatory regarding code compliance. However, the jurors were asked in a jury interrogatory,

> to determine as a whole whether the Association's publication (1) "contained a false or a misleading statement of fact in a commercial advertisement or promotion about the nature or quality of Plaintiff's nonstructural steel framing products," (2) whether the publication was "false," and (3) whether the Association made a "false and disparaging statement of fact about Plaintiff's products by publishing" the publication.

*Clarkwestern Dietrich Bldg. Sys., L.L.C. v. Certified Steel Stud Assn., Inc.*, 2017-Ohio-2713, ¶ 35 (12th Dist.) The CSSA could fairly point to a negative answer to these inquiries as evidence that the jurors concluded that the organization's statements about ClarkDietrich's products were true, and therefore not defamatory. As such, the directors could reasonably view a defense verdict as implicitly vindicating the statements in the CSSA's publication.

{¶ 72} Based on the foregoing analysis, the common pleas court properly determined, as a matter of law, that the business-judgment rule applied. The court could also find no genuine issues of any material fact, and that the evidence submitted,

- 24 -

construed most strongly in favor of the Receiver, could only lead reasonable minds to the conclusion there was some rationally conceivable basis for rejecting the settlement offer. *Spitzer*, 2021-Ohio-1913 at ¶ 6; Civ.R. 56(C). Accordingly, the common pleas court did not err in granting summary judgment in favor of Gardner and Slish on the Receiver's breach of fiduciary duty and declaratory judgment claims. *Id.*

### E. "Entire Fairness"

{¶ 73} The Receiver argues that the business-judgment rule does not apply here and that Gardner's and Slish's vote should have been reviewed under the more onerous "entire fairness" standard. However, because we have found the directors were not conflicted as a matter of law and did not lack independence, the Receiver did not meet her burden of overcoming the business-judgment rule and the entire-fairness standard need not be considered. *See Emerald Partners*, 787 A.2d at 91.[9]

{¶ 74} We overrule the Receiver's and ClarkDietrich's first assignments of error.

{¶ 75} The Receiver's second assignment of error states:

> THE TRIAL COURT ERRED BY DENYING SUMMARY JUDGMENT FOR THE RECEIVER.

{¶ 76} ClarkDietrich's second assignment of error states:

> THE TRIAL COURT ERRED BY DENYING THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT.

{¶ 77} The Receiver argues that the common pleas court erred by denying her motion for summary judgment, arguing again that the common pleas court should have

---

9. ClarkDietrich and the Receiver briefly mention an argument presented to the trial court, asserting that the trial court had previously determined that entire-fairness review applied to the directors' actions and that this ruling was "law of the case." In its summary judgment decision, the trial court rejected this argument, noting that the ruling was for the limited purpose of resolving a discovery dispute and pertained to the scope of allegations in the Receiver's complaint. Neither party presents any argument or assignment of error challenging this specific ruling. As the parties have not assigned error to this issue or articulated how this aspect of the decision was substantively erroneous, we need not address it here. App.R. 12(A)(1)(b).

reviewed the directors' actions under the "entire fairness" standard. The Receiver argues that if the court had applied that standard, Gardner and Slish could not demonstrate, as a matter of law, that the decision to reject the settlement offer was "entirely fair" to the CSSA. ClarkDietrich sets forth the same argument in its appellate brief.

{¶ 78} These assignments of error are meritless based on our resolution of the first assignments of error. As the directors were not financially interested or conflicted, the common pleas court properly reviewed their actions under the business-judgment rule and review under the entire-fairness standard was not required.

{¶ 79} We overrule the Receiver's and ClarkDietrich's second assignments of error.

### III. Conclusion

{¶ 80} The Receiver did not meet her burden of demonstrating that Gardner or Slish violated their duty of loyalty to the CSSA. The CSSA existed to promote its members' business interests and the interests of the CSSA and its member companies in rejecting the settlement offer and proceeding to a jury verdict were aligned. Gardner and Slish had a rational basis to reject the settlement offer. The common pleas court did not err when it granted Gardner's and Slish's motions for summary judgment and denied the Receiver's motion for summary judgment.

Judgment affirmed.

HENDRICKSON , P.J., and PIPER, J., concur.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.


/s/ Robert A. Hendrickson, Presiding Judge


/s/ Robin N. Piper, Judge


/s/ Matthew R. Byrne, Judge